# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEO INVESTMENTS HONG KONG LIMITED, a limited liability company organized under the laws of Hong Kong, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2022-0175-JTL |
| TOMALES BAY CAPITAL ANDURIL III, L.P., a Delaware limited partnership, and TOMALES BAY CAPITAL ANDURIL III GP, LLC, a Delaware limited liability company, and IQBALJIT KAHLON, Managing Member of Tomales Bay Capital Anduril III GP, LLC, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION REGARDING ACCESS TO TRIAL MATERIALS

Date Submitted: June 17, 2025
Date Decided: September 15, 2025

A. Thompson Bayliss, Adam K. Schulman, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Andrew W. Stern, Nicholas P. Crowell, Charlotte K. Newell, SIDLEY AUSTIN LLP, New York, New York; *Attorneys for Plaintiff.*

David E. Ross, Eric D. Selden, Thomas A. Barr, A. Gage Whirley, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Aaron H. Marks, Amal El Bakhar, Ahson T. Azmat, Elina Chen, Ava I. Roche, KIRKLAND & ELLIS LLP, New York, New York; *Attorneys for Defendants.*

Karen E. Keller, Emily S. DiBenedetto, Virginia K. Lynch, SHAW KELLER LLP, Wilmington, Delaware; Lin Weeks, REPORTERS COMMITTEE FOR THE FREEDOM OF THE PRESS, Washington, District of Columbia; *Attorneys for Pro Publica Inc.*

**LASTER, V.C.**

This decision addresses the ability of a news organization to access trial materials. Terminology in this area can be confusing. Cases speak of a right of "public access" and discuss materials becoming "public." It can therefore seem as if the analysis involves only a single question: Have the materials become publicly available?

In fact, there are two inquiries. The first is whether the materials are part of the record such that the right of access applies. The right of access does not extend to everything relating to a case. It does not, for example, encompass discovery materials that have never been filed with the court or used in a proceeding.

If the right of access applies, then the analysis proceeds to the second inquiry: whether the party seeking the materials can obtain them. The right of access is powerful, and if it applies, then the seeker can presumptively obtain the materials. But a party opposing access can defeat the seeker's right by demonstrating that (1) the materials contain confidential information and (2) providing access to the confidential information would result in particularized harm that is sufficiently serious to overcome the seeker's right. Relevant factors include the stage of the case and how the materials have been used. The right of access reaches its peak for materials a judge considers when making a decision, and particularly for trial materials. And some uses—such as showing materials in open court—render them non-confidential.

The news organization seeks access to lodged deposition transcripts. Those transcripts did not become subject to the right of access through the act of lodging

alone. In Court of Chancery parlance, lodging a transcript means docketing it so it is available to the court and the parties for easy use. If a party uses a portion, then Rule 5 requires that the party file it, and the portion used becomes subject to the right of access and presumptively accessible. Lodged portions that no one ever uses remain discovery materials and inaccessible.

Here, the news organization established that the parties used portions of lodged transcripts by referencing them during trial and citing them in post-trial briefing. By using them, the parties transformed those portions into filed documents. The news organization could seek access to those portions, and once it filed a challenge notice under Rule 5.1, any party opposing access had to file a public version.

This time, the parties neither filed the portions they used in compliance with Rule 5, nor public versions in response to the challenge notice under Rule 5.1. Ordinarily, those omissions could result in waiver of the right to seek confidential treatment. But this court has not previously addressed how Rules 5 and 5.1 apply to lodged deposition transcripts. Within ten days of this decision, the parties must file public versions of the portions they used. Rule 5.1 will govern any further challenges.[1]

---

[1] This decision interprets the current Court of Chancery Rules. I have some concern about the demands that Rule 5's filing requirement creates for lodged depositions. It means parties must track when they reference the lodged depositions during pre-trial briefing, trial, post-trial briefing, and post-trial argument, then file public versions of those portions. It is not clear to me that sufficient demand exists for access to those portions of lodged depositions to warrant the incremental effort.

Under the Chancellor's leadership, the Court of Chancery Rules Committee has been renovating the court's rules to align their language with the current style of

2

The news organization also sought access to video clips shown in open court. By showing the clips, the parties used portions of deposition transcripts, so under Rule 5, the parties who used the portions had to file them in the form used. The parties filed a joint notice of lodging saying the clips would not be filed. Rule 5 required filing.

By not filing the clips, the parties' lawyers assumed the obligation to serve as custodians of the clips as officers of the court, and they had a duty to maintain the clips in accordance with the retention periods identified in Rule 5.1. The Court of Chancery Rules already impose similar custodial obligations on lawyers for other unfiled discovery materials, and this role is no different.

The lawyers must now file the clips publicly. No one can seek confidential treatment because, having been shown in open court, the clips have not been maintained confidentially.

---

the federal rules and to conform them to current Chancery practice. In 2024, the Court of Chancery adopted renovated versions of Rules 5 and 5.1. Humans lack perfect foresight, and the renovated rules—like their predecessors—did not clearly address lodged depositions. I personally would support amending Rule 5 so that a party would not have to file portions of already lodged depositions when used. Instead, those portions would be treated as having been filed for purposes of Rule 5 and hence potentially accessible, but a party would not have to file a public version until a person served a challenge notice. Persons could evaluate whether to serve a challenge notice because the briefing, trial transcript, and hearing transcript would provide notice that portions of the lodged depositions had been used. While it is disappointing to consider revisiting recently renovated rules, I think the option is worth considering.

The news organization also sought access to the list of joint trial exhibits (the "Exhibit List") that the parties filed confidentially as an exhibit to the pre-trial order and periodically updated. The parties should have filed the Exhibit List publicly. The Exhibit List only identifies exhibits; it does not reveal their contents and could not qualify for confidential treatment.

After obtaining the Exhibit List, the news organization sought access to specific exhibits. Some only appeared on the Exhibit List. The parties cited others during trial or in their post-trial briefs.

The parties opposing access argued that the right of access does not extend to trial exhibits that were listed but never used. Not under the mechanism for admitting evidence that the parties adopted in this case. The pre-trial order stated that at the conclusion of trial, the exhibits were admitted into evidence, subject to any rulings by the court and with the parties' objections preserved. At the conclusion of the trial, therefore, the exhibits became part of the record and potentially accessible.

Other approaches are possible. Parties can move exhibits into evidence one by one, although the court discourages that approach because it consumes valuable trial time. Parties also can use the schedule-of-evidence mechanism outlined in the *Guidelines for Persons Litigating in the Court of Chancery* ("*Guidelines*").[2] Under that mechanism, the parties submit a schedule of evidence that identifies all of the

_____

[2] Available at https://courts.delaware.gov/chancery/guidelines.aspx.

4

exhibits cited in the parties' pre- or post-trial briefs, used at trial, or cited during post-trial argument. The record consists of those exhibits and any others that the court cites in its decision.

Here, the trial exhibits were subject to the right of access. Once the news organization served a challenge notice seeking access to specific exhibits, the parties had to file public versions. The parties did not file public versions for the exhibits that only appeared on the Exhibit List because they maintained that the right of access did not apply. As with the unfiled portions of deposition transcripts, failing to file public versions could constitute a waiver, but the court has not previously ruled on this issue. Within ten days, the parties must file public versions. Rule 5.1 will govern any further challenges.

The parties opposing access properly filed public versions of the exhibits they used at trial or cited in their post-trial briefs. The news organization challenged the redactions, and the parties opposing access failed to demonstrate that the redacted portions warranted confidential treatment. The parties must file those exhibits publicly, without redactions.

## I. FACTUAL BACKGROUND

The facts regarding the merits of the underlying case are drawn from the court's post-trial decision (the "Opinion").[3] Facts pertinent to the dispute over access are drawn from the materials submitted in connection with the motions for confidential treatment, as well as materials suitable for judicial notice.

### A. Kahlon And The Fund

Iqbaljit Kahlon is the managing partner of Tomales Bay Capital, L.P., an investment advisor. Through that entity, Kahlon forms and manages special purpose vehicles that invest in technology companies. Most of the targets are privately held entities from Silicon Valley. Kahlon's bread and butter has been investing in Space Exploration Technologies Corporation ("SpaceX").

Kahlon's latest SpaceX opportunity resulted from a dispute between SpaceX and an investor whom SpaceX's CFO Bret Johnsen viewed as *persona non grata.* Johnsen thought Kahlon would be a "better custodian" of the investor's shares and wanted Kahlon to buy them.[4]

Kahlon formed entities to use when acquiring the shares. One was Tomales Bay Capital Anduril III, L.P. (the "Fund"). Its general partner was Tomales Bay

---

[3] *Leo Invs. Hong Kong Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, --- A.3d ---, 2025 WL 1807887 (Del. Ch. June 30, 2025). This decision uses the same citation conventions as the Opinion.

[4] Kahlon Tr. 221; *see also* JX 75 at 6.

Capital Anduril III GP, LLC. Kahlon served as the general partner's managing member.

**B.    Leo Group Invests In The Fund.**

Kahlon asked Gulf Asia Venture Group LLC ("Gulf Asia") to find investors for the Fund. In October 2021, Gulf Asia contacted Steven Xubo Zhang, a director and vice president of Leo Group Co., a company headquartered in the People's Republic of China and organized under its laws. Leo Group primarily engages in manufacturing and digital marketing but also has an investment arm. Leo Group's shares trade publicly on the Shenzhen Stock Exchange. After Zhang expressed interest, Gulf Asia sent him the Fund's limited partnership agreement, a private placement memorandum, and a subscription booklet.

On November 1, 2021, Kahlon, Zhang, and Gulf Asia met by video conference to discuss the investment. About ten days later, Leo Group's lawyers began negotiating a side letter with the Fund's lawyers. The side letter addressed topics that included Leo Group's disclosure obligations under the rules of the Shenzhen Stock Exchange. After some back and forth, the lawyers agreed on a disclosure that Leo Group could make and attached the disclosure as Exhibit A to the side letter.

On November 15, 2021, Leo Group executed the subscription agreement and side letter. The next day, Leo Group transferred $50 million to the Fund as its capital contribution. The Fund accepted Leo Group as a limited partner.

## C.  The Public Announcement

On November 16, 2021, Leo Group filed the agreed-upon disclosure. Chinese media covered the announcement.

Kahlon saw one of the news articles. Even though he had participated directly in negotiating the side letter, and even though he had agreed to the disclosure's contents, Kahlon was genuinely surprised by the announcement. He immediately worried that the announcement would jeopardize the deal with SpaceX.

Kahlon's first instinct was to push the deal through and hope SpaceX would not notice the media coverage. To that end, he quickly took three steps.

First, he sent the proposed stock purchase agreement to SpaceX. SpaceX had thirty days after receiving notice of a proposed sale to exercise a right of first refusal ("ROFR"). By sending the stock purchase agreement, Kahlon started the ROFR clock.

Second, Kahlon asked Leo Group to contain the media attention. Leo Group had bargained to make the disclosure and merely did what it had secured the right to do, but nevertheless accommodated Kahlon's request. Leo Group convinced many of the media platforms to take down their articles or minimize their circulation. Leo Group also asked the Shenzhen Stock Exchange and the local office of the Securities Regulatory Bureau to make any requests for further information confidentially.

Third, Kahlon and Gulf Asia began looking for investors to replace Leo Group if SpaceX objected. Kahlon thought SpaceX would likely see the media coverage and

insist that they replace Leo Group.[5] He also worried about his own relationship with SpaceX.[6] But Kahlon said nothing, hoping SpaceX would not find out.

## D.    SpaceX Notices The Chinese Press Coverage.

On November 19, 2021, SpaceX's head of government affairs noticed the Chinese press coverage. He sent Johnsen a link to an English language article titled "Elon Musk gets backing from a prolific Chinese tech investor."[7] The article cited Leo Group's announcement, noted that Leo Group had invested through a fund, briefly described SpaceX and Leo Group, and commended Leo Group for investing in a visionary technology company.[8] Except for the compliment, Kahlon had approved each detail by signing off on Exhibit A.

For Johnsen, the title of the article alone created problems: SpaceX's competitors for sensitive government contracts could attack its "backing" from a Chinese investor. Johnsen emailed Kahlon with the subject line "Leo Investments?"[9] The body of the email included a link to the article and asked "What is this?"[10]

---

[5] JX 531 at 53 ("Bro I think this deal is gonna die. We need to find capital fast. To replace Leo [sic].").

[6] *Id.* at 56 ("No communication from company which [sic] also messes with me . . . I don't know if I will survive this.").

[7] Johnsen Tr. 198–99; *see also* JX 183 at 2.

[8] JX 183 at 3.

[9] *Id.* at 1.

[10] *Id.*

9

Kahlon immediately called Johnsen. Neither remembers the exact words used, but Johnsen expressed his surprise and displeasure.[11] He stressed why suggesting that SpaceX had "backing" from Leo Group created problems for SpaceX.[12]

Kahlon blamed the media attention on Leo Group. He did not tell Johnsen that the disclosure was legally required. He did not mention that he knew about the disclosure and authorized it in advance. He did not recount the effort spent hammering out agreed-upon language. He did not explain that Leo Group's announcement faithfully tracked that disclosure. Johnsen did not learn any of these facts until his deposition in this litigation.

For Kahlon, setting up Leo Group was part of the plan. He wanted to preserve his relationship with SpaceX. As he later explained in a text message, "[S]x [sic] is gonna blame leo [sic] on all this. . . . i [sic] should be fine."[13]

At the end of the call, Johnsen made clear that he would not let the Fund buy SpaceX shares if Leo Group remained an investor.[14] Kahlon apologized and assured Johnsen he would "fix it," meaning that Leo Group "would not be investing."[15]

---

[11] Johnsen Tr. 186, 188.

[12] *Id.* at 184.

[13] JX 531 at 74.

[14] Johnsen Tr. 188, 201.

[15] *Id.* at 186–87.

**E.** **Kahlon Removes Leo Group From The Fund.**

On November 20, 2021, Gulf Asia told Zhang that Kahlon intended to remove Leo Group from the Fund.[16] The next day, Kahlon, Zhang, and Gulf Asia had a two-hour zoom meeting.[17] During the call, Zhang told Kahlon that Leo Group would "be exposed to harrowing consequences if [Kahlon] truly insisted on removing" them.[18] His plea fell on deaf ears. Kahlon had made his decision.[19]

Before the call ended, Kahlon sent Zhang a proposed letter agreement providing for Leo Group's withdrawal. After Leo Group refused to sign, Kahlon invoked a provision in the Fund's governing agreement and deemed the Leo Group to have withdrawn. He texted Johnsen hours later, writing: "[T]hey are out of our fund."[20] Kahlon then spoke briefly with Johnsen. He left Johnsen with the impression that Leo Group was a "bad actor."[21]

---

[16] JX 208 at 13–17; *see also* JX 200 at 25.

[17] JX 203; Kahlon Tr. 270.

[18] Zhang Tr. 62–63.

[19] *Id.* at 63.

[20] JX 204.

[21] Kahlon Tr. 403.

11

On November 22, 2021, Kahlon returned Leo Group's capital contribution. On November 25, Leo Group made a public filing about its removal from the Fund.[22] Its stock price dropped 10.11% from the prior day's close.[23]

On December 13, 2021, SpaceX exercised its ROFR for 81% of the shares. On December 17, the Fund and an affiliate bought the other 19%.

**F.     This Litigation And The Dispute Over Access**

On February 23, 2022, Leo Group sued Kahlon, the Fund, and its general partner for breach of contract and breach of fiduciary duty. A three-day trial took place in open court.

In preparation for trial, the parties lodged deposition transcripts and identified 560 exhibits on their joint exhibit list (the "Exhibit List"). During trial, the parties cited portions of the lodged transcripts and played video clips from the depositions of Johnsen and Kamran Bajwa, one of Kahlon's lawyers. They also used many of the trial exhibits. Six witnesses testified live.

During pre- and post-trial briefing, the parties cited trial exhibits and sections of the deposition transcripts that had not been used in open court. Some trial exhibits were not used at all. Large sections of the lodged deposition transcripts were not used.

---

[22] JX 248.

[23] PTO ¶ 66.

12

On April 9, 2025, Pro Publica, Inc. filed a notice challenging the confidential treatment of specific documents. Pro Publica is a Pulitzer Prize winning news organization focused on investigative journalism in the public interest.

Pro Publica sought to access a draft version of the Exhibit List, the final Exhibit List, and five joint trial exhibits.[24] Pro Publica also sought access to four lodged deposition transcripts in their entirety—those of Kahlon, Johnsen, and Bajwa[25]—and specifically sought the video clips shown at trial. Pro Publica noted that no public versions had been filed for any of the documents.

Leo Group filed a public version of one trial exhibit that made the document public in its entirety.[26] Leo Group did not seek confidential treatment for any of the challenged materials.

Kahlon filed public versions containing no redactions for the draft Exhibit List, the final Exhibit List, and two trial exhibits.[27] He moved for continued confidential treatment for three of the four deposition transcripts and one of the remaining trial

---

[24] The five trial exhibits were JX 38, JX 101, JX 184, JX 320, and JX 1040.

[25] The four lodged deposition transcripts were for the February 22, 2024 deposition of Kahlon, the June 17, 2024 deposition of Kahlon, the March 5, 2024 deposition of Johnsen, and the June 4, 2024 deposition of Bajwa.

[26] JX 38.

[27] JX 101, JX 1040.

exhibits.[28] He argued that the lodged deposition transcripts never became subject to the right of access, and he contended that Pro Publica had no need for the video clips because Pro Publica could review the substance of the testimony from the publicly available trial transcript. Kahlon further argued that the clips themselves were not subject to the right of access because they had not been filed with the court—only lodged. He sought confidential treatment for the fourth trial exhibit.[29]

The fifth trial exhibit was an email that attached versions of the stock purchase agreements.[30] SpaceX filed a public version of that exhibit with extensive redactions. SpaceX moved for continued confidential treatment and joined in Kahlon's arguments. SpaceX also moved for continued confidential treatment of the Johnsen deposition transcript.[31]

Pro Publica opposed the motions for continued confidential treatment. Pro Publica argued that the right of access attached to the deposition transcripts because the parties (i) filed the deposition transcripts and video clips by lodging them, (ii) used the deposition transcripts at trial by citing them, (iii) used the deposition transcripts by showing the video clips at trial, and (iv) used the deposition transcripts

---

[28] Dkt. 253. Technically, all of the defendants filed the motion, but Kahlon controls the two entity defendants, so for simplicity, this decision refers to Kahlon.

[29] JX 320.

[30] JX 184.

[31] Dkt. 255.

14

by citing them in post-trial briefing. Pro Publica argued that the right of access applied to all of the trial exhibits on the Exhibit List. Pro Publica also noted that the parties had relied on one exhibit to support a stipulated fact in the parties' pre-trial stipulation and order, which the court approved.[32] Pro Publica argued that Kahlon and SpaceX could not carry their burden to show that any materials were entitled to confidential treatment.

Rule 5.1 does not contemplate reply submissions in support of motions for confidential treatment. The court entered an order permitting SpaceX to file a reply and requiring Kahlon to file a reply. The replies brought briefing on Pro Publica's initial challenges to a close.

Pro Publica next filed a notice challenging the confidentiality of twelve trial exhibits. Eleven were exhibits for which no public version had been filed.[33] The twelfth was the public version containing redactions that SpaceX filed in response to Pro Publica's first challenge.[34]

Kahlon moved for continued confidential treatment for seven exhibits.[35] He contended that unless a party or the court used or referenced a trial exhibit, they

---

[32] JX 320.

[33] JX 17, JX 42, JX 54, JX 276, JX 406, JX 524, JX 536, JX 537, JX 540, JX 541, JX 543.

[34] JX 184.

[35] JX 54, JX 276, JX 524, JX 536, JX 537, JX 541, JX 543.

15

remained discovery materials that never became subject to the right of access. And he argued that because of language in the pre-trial order, the act of listing exhibits on the Exhibit List did not make them public documents to the same degree as if they had been used in court. He filed a public version of an eighth exhibit.[36] He pointed out that a ninth exhibit already was available publicly elsewhere on the docket.[37] He did not address the other exhibits, leaving them to SpaceX.

SpaceX also moved for continued confidential treatment. SpaceX argued that two exhibits were never used in open court or cited in post-trial briefing and so should not be subject to the right of access.[38] In response to the challenge to the publicly filed version of the email with the stock purchase agreements, SpaceX filed a less redacted version and argued that the redacted information warranted confidential treatment.[39]

Pro Publica opposed the motions and asked the court to order the filing of public versions of three exhibits.[40] Pro Publica also asked that the court order the filing of the email with the stock purchase agreements with no redactions other than

---

[36] JX 17.

[37] JX 406.

[38] JX 42, JX 540.

[39] JX 184.

[40] JX 17, JX 524, JX 543.

16

for personal addresses.[41] Pro Publica asked the court to defer ruling on the other trial exhibits until after the court had resolved Pro Publica's other challenges.[42]

On June 30, 2025, the court issued the Opinion. It relied on eight of the trial exhibits that Pro Publica seeks.[43] The parties have not had an opportunity to update their positions in light of the Opinion's citations to those exhibits.

## II. LEGAL ANALYSIS

This dispute concerns the right of access to trial materials. "Under the First Amendment of the United States Constitution and as a matter of common law, the public has a presumptive right of access to judicial records."[44] The Delaware Constitution of 1897 elevates the right of access to the level of a constitutional directive by stating that "[a]ll courts shall be open."[45]

Those principles rest on the foundational premise that the public's right of access to judicial proceedings is "fundamental to a democratic state and necessary in the long run so that the public can judge the product of the courts in a given case."[46]

---

[41] JX 184.

[42] JX 42, JX 54, JX 276, JX 536, JX 537, JX 540, JX 541.

[43] *See* JX 17, JX 42, JX 54, JX 276, JX 320, JX 536, JX 537, JX 541.

[44] *Twitter, Inc. v. Musk*, 2024 WL 4441869, at *1 (Del. Ch. Oct. 8, 2024); *accord In re Columbia Pipeline Gp.*, 2018 WL 4182207, at *1 (Del. Ch. Aug. 30, 2018).

[45] Del. Const. art. I, § 9.

[46] *Al Jazeera Am., LLC v. AT&T Servs., Inc.*, 2013 WL 5614284, at *3 (Del. Ch. Oct. 14, 2013).

17

Public accountability helps "ensure quality, honesty and respect for our legal system."[47] Parties "who decide to litigate in a public forum . . . must do so in a manner consistent with the right of the public to follow and monitor the proceedings and result."[48]

Under Delaware law, those principles "translate into a presumption that the public has a right of access to all judicial proceedings and court records."[49] Rule 5.1 reflects the Court of Chancery's commitment to those principles.[50] Before the adoption of Rule 5.1, an excessive number of confidential filings left the public "with an improperly narrow view" of the court's cases.[51] Rule 5.1 codified the principle "[c]onfidentiality is the exception, and not the rule."[52]

Under Rule 5.1, judicial proceedings "are open to the public, unless the Court orders otherwise."[53] "Papers filed with the Register in Chancery ('Filed Documents')

---

[47] *Horres v. Chick-fil-A, Inc.*, 2013 WL 1223605, at *1 (Del. Ch. Mar. 27, 2013) (internal quotation marks omitted).

[48] *Al Jazeera*, 2013 WL 5614284, at *7.

[49] *In re Oxbow Carbon LLC*, 2016 WL 7323443, at *1 (Del. Ch. Dec. 15, 2016).

[50] *Horres*, 2013 WL 1223605, at *2.

[51] *Al Jazeera*, 2013 WL 5614284, at *3.

[52] *GKC Strategic Value Master Fund, LP v. Baker Hughes Inc.*, 2019 WL 2592574, at *5 (Del. Ch. June 25, 2019).

[53] Ct. Ch. R. 5.1(a)(2).

must be available to the public," except when Rule 5.1 allows a "Confidential Filing."[54] Only the court, the filer, persons served with the paper, and persons otherwise authorized by court order can access a Confidential Filing. Rule 5.1 refers to that status as "confidential treatment."[55]

"Rule 5.1 does not apply to materials exchanged during discovery that do not become Filed Documents."[56] Once a paper is filed with the court, however, the right of access applies. Rule 5(c)(3) addresses when discovery material must be filed.[57] For depositions, it states: "Depositions need not be filed with the Court. But if used in the proceeding—or if the Court orders—then the deposition transcript, or a relevant portion, must be filed with the Court."[58]

A person may file a paper confidentially if the filer believes in good faith that it contains "Confidential Information."[59] A person must file a paper confidentially if the filer believes that another person would assert that it contains "Confidential Information."[60] To warrant that status, the filer must believe and be prepared to

---

[54] *Id.* 5.1(a)(3).

[55] *E.g.*, *id.* 5.1(g), (h).

[56] *Id.* 5.1(a)(4).

[57] *Id.* 5(c)(3).

[58] *Id.* 5(c)(3)(E).

[59] *Id.* 5.1(d)(1).

[60] *Id.* 5.1(d)(2).

prove that the information had been maintained confidentially and was not otherwise publicly available.[61] If the filer can make that threshold determination, then the filer must also believe and be prepared to prove that (1) public access to the information would cause particularized harm and (2) the magnitude of the harm from public access would outweigh the public interest in the information.[62] A filer thus cannot simply assert that access creates a risk of harm. The party must believe and be prepared to prove that access "will cause particularized harm" and that the resulting harm "outweighs the public interest."[63]

After making a Confidential Filing, the filer must file a public version, except for lodged depositions and exhibits.[64] The public version may only contain redactions that the filer believes in good faith to constitute Confidential Information. The remainder of the information in the public version must be unredacted.

"Any person may challenge the confidential treatment of a Confidential Filing."[65] The vehicle is a challenge notice.[66] If no public version yet exists, then the filer must respond to the challenge notice by filing a public version that only redacts

---

[61] *Id.* 5.1(b)(2)(A), (B).

[62] *Id.* 5.1(b)(2)(C), (D).

[63] *Id.*

[64] *Id.* 5.1(f)(1).

[65] *Id.* 5.1(g)(1).

[66] *Id.* 5.1(g)(2).

Confidential Information. If a public version exists, then the filer must either permit the Confidential Filing to become public or move for continued confidential treatment.[67]

The person seeking continued confidential treatment always bears the burden of persuading the court that confidential treatment is warranted.[68] That means establishing that the filing contains Confidential Information. To meet that test, the person opposing access must show that the materials were maintained confidentially and not otherwise publicly available. The person opposing access also must make a particularized showing of harm and show that the harm outweighs the public interest in access.[69]

When ruling on a confidentiality challenge, "the court must balanc[e] . . . the public interest against the harm that public disclosure might entail with respect to sensitive nonpublic information."[70] The harm cannot be general but must be particularized, and a person must proffer "tangible evidence of concrete damage."[71]

---

[67] *Id.* 5.1(g)(6).

[68] *Id.* 5.1(g)(6)(D).

[69] *Id.* 5.1(b)(2)(C), (D).

[70] *In re Oxbow Carbon*, 2016 WL 7323443, at *2 (internal quotation marks omitted).

[71] *Id.*

The court also must consider the strength of the public interest,[72] which is at its height for materials a judge relies on when making a decision,[73] and particularly for trial materials.[74]

## A. The Lodged Deposition Transcripts

Pro Publica first seeks access to four deposition transcripts lodged with the court. Portions fall into different categories. Some merely exist on the docket because the parties lodged the full transcripts ("Only-Lodged Portions"). Pro Publica showed that the parties referenced other portions at trial or cited them in their post-trial briefs. The parties showed video clips of some portions at trial. And although the

[72] *See Tornetta v. Musk*, 2022 WL 130864, at *4–5 (Del. Ch. Jan. 14, 2022) (evaluating the strength of the public interest in different types of materials); *GKC*, 2019 WL 2592574, at *2 (agreeing that evaluating the strength of the public interest "would be an appropriate matter for the weighing of interests with which the Court is charged under Rule 5.1").

[73] *See Paul v. Rockpoint Gp., LLC*, 2021 WL 3262122, at *2 (Del. Ch. July 29, 2021) ("The public interest in access to court materials is particularly acute when the court relies on them as the basis for an adjudication."); *In re Oxbow Carbon*, 2016 WL 7323443, at *2 ("The public interest is paramount when the information provided the basis for a judicial decision."); *In re Nat'l City Corp. S'holders Litig.*, 2009 WL 1653536, at *1 (Del. Ch. June 5, 2009) ("[T]he public has a strong interest in obtaining the information contained in the court record, including ascertaining what evidence the court relied upon in reaching its decision.") (internal quotation marks omitted); *see also Al Jazeera*, 2013 WL 5614284, at *1 (discussing the importance of the public being able to understand the basis for a judicial decision).

[74] *ADT Hldgs., Inc. v. Harris*, 2017 WL 4317245, at *1 (Del. Ch. Sept. 28, 2017) (noting that the right of access is "at its height during a trial").

22

parties did not know it before the court issued the Opinion, the court cited some portions in its decision.

### 1. The Only-Lodged Portions

Pro Publica seeks access to four deposition transcripts that the parties lodged with the court. Kahlon and SpaceX respond that they only *lodged* the transcripts, so they did not become subject to the right of access. That argument raises a baseline issue: What is the status of the Only-Lodged Portions?

"Lodging" does not have a widely accepted legal meaning. Neither *Black's Law Dictionary*[75] nor *Garner's Dictionary of Legal Usage*[76] contains a pertinent definition. One legal website, however, defines "lodg[ing]" as "deliver[ing] a legal document to the court clerk or record custodian for placement into the official record."[77] From that perspective, lodging and filing are the same.

In Chancery practice, however, lodging and filing are different. Court of Chancery Rule 5.1 refers specifically to the concept of lodging a deposition transcript and exempts the party lodging it from the obligation to promptly file a public version.[78] Rule 5, by contrast, refers to the concept of filing. It states: "[I]f used in the

---

[75] *See, e.g.*, *File, Black's Law Dictionary* (12th ed. 2024).

[76] Bryan A. Garner, *Garner's Dictionary of Legal Usage* 553 (3d ed. 2011).

[77] https://lsd.law/define/lodge.

[78] Ct. Ch. R. 5.1(f)(1).

proceeding—or if the Court orders—then the deposition transcript, or a relevant portion, must be filed with the Court."[79]

The distinction recognizes that depositions are primarily discovery devices. "[T]he scope of discovery pursuant to Court of Chancery Rule 26(b) is broad and far-reaching."[80]

> Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, including the existence, description, nature, custody, condition and location of any documents, electronically stored information, or tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial.[81]

"Discovery is called that for a reason. It is not called 'hide the ball.'"[82]

By rule, a party may object to a question during a deposition, but the evidence is taken "subject to the objections."[83] "A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation on evidence directed by the Court, or to present a motion under paragraph (d)(3)."[84] A motion

---

[79] *Id.* 5(c)(3)(E).

[80] *Cal. Pub. Emps.' Ret. Sys. v. Coulter*, 2004 WL 1238443, at *1 (Del. Ch. May 26, 2004).

[81] Ct. Ch. R. 26(b)(1).

[82] *Twitter, Inc. v. Musk*, 2022 WL 3591142, at *1 (Del. Ch. Aug. 23, 2022).

[83] Ct. Ch. R. 30(c). Objections to admissibility are preserved and may be made when a party seeks to use the deposition. *Id.* 32(b).

[84] *Id.* 30(d)(1).

24

under Rule 30(d)(3) seeks to terminate or limit a deposition "upon a showing that the examination is being conducted or defended in bad faith or in such manner as unreasonably to annoy, embarrass or oppress the deponent or party."[85] Lawyers are understandably reluctant to call the court mid-deposition to present such a motion. Lawyers risk sanctions if they unilaterally shut down questioning on grounds other than privilege.[86] The limitations on interference mean that a party taking the deposition has great freedom to conduct an expansive inquiry. Discovery depositions can reach hundreds of pages and contain information of debatable relevance to the litigation.

Depositions are nevertheless a form of testimony that can be used in court for many purposes.[87] The Court of Chancery seeks to promote the efficient use of depositions by distinguishing between lodging and filing. Lodging refers to the act of submitting an entire deposition to the court by placing it on the docket via a notice of lodging. Lodging makes the deposition easily accessible should the parties choose to use it. Under Rule 5, use triggers a filing requirement, and filing brings the relevant portion within the right of access.

---

[85] *Id.* 30(d)(3).

[86] *E.g., In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 562 (Del. Ch. 2014) (imposing sanctions on counsel for instructing witness not to answer based on claims of lack of relevance or admissibility).

[87] *See* Ct. Ch. R. 32(a).

There are two principal alternatives to lodging. One is to take a second deposition—sometimes known as a trial deposition—that only elicits the evidence that the party wishes to introduce. The Court of Chancery Rules and the Delaware Rules of Evidence address depositions; they do not distinguish between discovery depositions and trial depositions.[88] For counsel to go through the process of taking a

---

[88] Some jurisdictions distinguish between so-called "discovery depositions" and "trial depositions." *See, e.g.*, Linda Miller Atkinson, *Preliminary considerations—Strategy, objectives and purposes of deposition*, 2 Litigating Tort Cases § 18:2 (Oct. 2024). The Court of Chancery generally does not.

When reviewing decisions involving jury trials, the Delaware Supreme Court has indicated that taking a trial deposition can have implications for a party's ability to use a discovery deposition at trial. *Compare Barrow v. Abramowicz*, 931 A.2d 424, 431 (Del. 2007) ("We agree with the Barrows that *Green* controls and find the distinction between a trial deposition and a discovery deposition superfluous on the facts here."), *with Green v. Alfred A.I. duPont Inst. of Nemours Found.*, 759 A.2d 1060, 1065 (Del. 2000) (permitting the use at trial of an opposing expert's trial deposition, even after the party sponsoring the expert decided not to call the expert, because the deposition was taken with the understanding that it would be used at trial). For its part, the Delaware Superior Court has taken the view that lawyers need not assume that every discovery deposition can be used at trial. *See Hambleton v. Christina Care Health Servs., Inc.*, 2002 WL 183851, at *4 (Del. Super. Ct. Jan. 31, 2002) ("The Court does not believe that opposing counsel must always realize or appreciate there is a substantial risk that every discovery deposition could be used at trial. If so, this would result in prolonging, making more expensive and more treacherous discovery depositions."); *see also Menzel v. Wilson*, 2011 WL 676177, at *4–5 (Del. Super. Ct. Feb. 22, 2011) (relying on *Hambleton* when declining to let party use discovery deposition at trial where defendant withdrew witness). The Court of Chancery has not drawn a similar distinction between discovery depositions and trial depositions, and counsel should assume that every discovery deposition could be used at trial to the extent permitted by Rule 32 or the Delaware Rules of Evidence.

second deposition is generally unnecessary and, while not prohibited,[89] imposes incremental burdens.

The other alternative involves designating portions of a deposition for use as evidence. That iterative process involves (i) the proponent designating testimony, (ii) the opponent responding with evidentiary objections and its own counter-designations, (iii) the proponent responding to those objections, making its own evidentiary objections to the counter-designations, and introducing its own counter-counter designations, and (iv) the proponent and opponent continuing the back and forth until no one has anything more to add. By the end of the process, much of the deposition will be marked for use. Multiply that process across many depositions, and it results in junior attorneys and paralegals spending many hours wielding a highlighting tool, followed by more senior attorneys reviewing their designations and negotiating over objections. Parties may then feel the need to bring their disputes to the court for prophylactic rulings during the pre-trial conference. And all to address portions of depositions that may never be used.

Permitting lodging avoids these inefficiencies and defers disputes until a party uses a portion of the deposition. At that point, the opposing party can decide whether to raise and seek resolution of any evidentiary objections. The opposing party can also

---

[89] *E.g.*, *Stone v. Stant*, 2008 WL 4482707, at *2 (Del. Ch. Sept. 29, 2008) (addressing dispute over divergence between discovery deposition and trial deposition).

introduce additional portions under the rule of completeness.[90] Disputes get addressed when they matter.

For this process to work, however, the act of lodging must have limited implications. Although lodging puts the deposition on the docket, it does not by itself bring the transcript within the right of access. Rule 5 has that effect by requiring that a party file any portion of a deposition that the party uses, and that portion of the deposition becomes subject to the right of access. The right of access does not apply to discovery materials that are not used.[91]

A challenge notice has no effect on the portions of a lodged deposition that no one has used because those portions have not yet come within the right of access. Pro Publica therefore cannot access any Only-Lodged Portions. To the extent Pro Publica seeks those portions, the request for access is denied.

---

[90] *See* D.R.E. 106.

[91] *Partner Invs., L.P. v. Theranos, Inc.*, 2018 WL 1906085, at *2 (Del. Ch. Apr. 23, 2018) ("Until the discovery materials are submitted to the court, the public's right of access does not apply."). In *Theranos*, the court did not have to ponder the distinctions between lodging versus filing, and the court used the term "lodging" loosely as if they were interchangeable. *See id.* ("For purposes of the public's right of access, materials developed during the pre-trial discovery process are not part of the presumptively public record until they are filed with the court, such as by being placed on the docket or lodged in evidence."). No one should attribute meaning to that loose usage.

**2.      The Portions Cited At Trial And In Post-Trial Briefing**

Pro Publica showed that the parties cited portions of the lodged depositions during trial and in their post-trial briefs, and those portions comprise the next category for analysis. By citing those portions, the parties used them for purposes of Rule 5(c)(3)(E). They therefore took on the obligation to file those portions, and Rule 5.1 governs whether they could be filed confidentially. A party conceivably could believe in good faith that a cited portion of a deposition transcript nevertheless qualifies for confidential treatment.

Here, no one filed public versions of the portions cited in the pre- and post-trial briefs. But in this case, the failure was excusable. This court has not previously addressed how Rules 5 and 5.1 apply to lodged depositions.

Within ten days after the issuance of this decision, the parties must file public versions of the portions of the lodged depositions that they used in their post-trial briefs or at trial.  Rule 5.1 will govern any further challenges.

**3.      The Portions Shown As Video Clips**

The last category consists of video clips shown at trial. The parties used portions of the lodged depositions by playing the clips, making them part of the record and subject to the right of access.

SpaceX and Kahlon argue that the video clips of Johnsen's testimony are not subject to the right of access because the clips never became "Filed Documents" under Rule 5.1. Rule 5(c)(3)(E) requires that a party file any portion of a deposition that the

29

party uses in a proceeding.[92] Rule 32(e) provides that "[e]xcept as otherwise directed by the Court, a party offering deposition testimony . . . may offer it in stenographic or nonstenographic form."[93] By showing the video clips at trial, Kahlon offered deposition testimony in nonstenographic form. Having done so, he had an obligation to file the deposition testimony in that same nonstenographic form.[94]

The parties *lodged* the video clips by referencing them in a joint notice of lodging and stating that the clips would not be *filed*.[95] The parties had an obligation to *file* the video clips. Counsel should have docketed a notice of filing and provided the clips to the court on a portable drive.

Because they did not file the video clips, counsel became custodians of the clips in their capacity as officers of the court. While the court's rules do not address clips, they do provide that counsel act as custodians for discovery materials not filed with the court.[96] The Delaware Supreme Court has made clear that Delaware lawyers always act as officers of the court.

---

[92] Ct. Ch. R. 5(c)(3)(E) ("Depositions need not be filed with the Court. But if used in the proceeding—or if the Court orders—then the deposition transcript, or a relevant portion, must be filed with the Court.").

[93] *Id.* 32(e).

[94] *Theranos,* 2018 WL 1906085, at *4 ("The transcript version of the testimony and the video version of the testimony are conceptually distinct.").

[95] Dkt. 233.

[96] *E.g.,* Ct. Ch. R. 5(c)(3)(C) ("If a request or response is served electronically, then the electronically served version constitutes the original for purposes of these

> All members of the Delaware Bar are officers of the Court. Although a lawyer has a duty to his or her client, each Delaware lawyer has sworn an oath to practice "with all good fidelity as well to the Court as to the client." This responsibility to the "Court" takes precedence over the interests of the client because officers of the Court are obligated to represent these clients zealously *within* the bounds of both the positive law and the rules of ethics.[97]

As custodians, counsel undertook the obligation to preserve the clips in accordance with the retention periods in Rule 5.1.

Rule 5.1 therefore applies to the video clips as Filed Documents. To qualify as Confidential Information, the information must have been "maintained confidentially."[98] The court did not grant a motion to close the courtroom before their presentation, so the clips became public when played in court. From that point on, they could no longer qualify as Confidential Information because they had not been "maintained confidentially."[99] They had to be filed publicly.

In response to that straightforward analysis, Kahlon and SpaceX contend that the court approved continued confidential treatment for any deposition testimony presented in open court. That argument fails.

---

rules. Otherwise, the party serving the request or response must retain the original and becomes its custodian. If a Delaware attorney has appeared, then a Delaware attorney must be the custodian.").

[97] *In re Abbott,* 925 A.2d 482, 487–88 (Del. 2007).

[98] Ct. Ch. R. 5.1(b)(2)(A).

[99] *Id.*

To govern discovery, the parties agreed to a confidentiality order (the "Protective Order"). Its language tracked the court-approved form and stated:

> In the event that any Confidential Discovery Material is used in open court during any court proceeding or lodged as a trial exhibit, the material shall lose its confidential status and become part of the public record, unless the Producing Party applies for and obtains an order from this Court specifically maintaining the confidential status of particular material. Prior to any court proceeding in which Confidential Discovery Material is to be used, counsel for the Parties shall confer in good faith on such procedures that may be necessary or advisable to protect the confidentiality of any such Confidential Discovery Material.[100]

The Protective Order thus properly provided that when a party uses materials in open court, they become public.

In the pre-trial order, by contrast, the parties included five words purporting to establish an impossibility. Paragraph 118 stated:

> The lodging of, or any other presentation of, deposition testimony with the Court . . . shall not constitute "use[] in open court during any court proceeding or lodg[ing] as a trial exhibit" under Paragraph 24 of the [Protective Order].[101]

The critical five words are "or any other presentation of."

As discussed, lodging a transcript is not use in open court. It is not even sufficient standing alone to bring the lodged transcript within the right of access. That aspect of the stipulated language was unobjectionable.

---

[100] Dkt. 41.

[101] Dkt. 221 ¶ 118.

32

As written, however, "any other presentation" includes reading deposition testimony in open court or showing video clips in open court. That goes too far. Reading or showing deposition testimony in open court constitutes use in open court.

The parties did not call the five words to the court's attention during the pre-trial conference, and the court did not catch them when reviewing the forty-three page, 153-paragraph order. Had they been noticed, the court would have stricken them. A judge sitting in equity has many powers, but not the power to alter reality. Playing the video clips in open court made the testimony public.

As a fallback, SpaceX and Kahlon argue that Pro Publica can access the trial transcript and obtain the content of the video clips that way. But the parties played the clips. They therefore had to file the clips, and the right of access applies to the clips. Had the parties chosen to read from the deposition transcripts, then Pro Publica only would get the transcripts.[102] But the parties wisely wanted the court to see the witnesses, and their credibility helped Kahlon largely carry the day. Pro Publica gets the clips.

### 4.    The Portions The Court Cited

The last category concerns sections from the lodged depositions that the court cited. The court is not restricted to considering the portions of a lodged deposition

---

[102] *See Theranos,* 2018 WL 1906085, at \*4 (denying access to video deposition where party only filed transcript); *id.* ("Unless a party also files the video, the video corresponding to the filed portion of the transcript does not become part of the presumptively public record.").

that the parties use. As explained in the *Guidelines*, "Absent objection or agreement to the contrary, the Court may consider the entirety of the lodged deposition. But the parties should expect that the Court will focus on the portions cited."[103]

The parties did not file the cited portions, but that does not waive their right to seek confidential treatment. The parties could not have known what portions the court would cite. Nor does Rule 5 call for the parties to file portions of the testimony that the court used.

Since the court issued the Opinion, Pro Publica has not issued a challenge notice directed to any testimony the court cited. If Pro Publica does, then the parties must file public versions in compliance with Rule 5.1, and the process will unfold in compliance with that rule.

## B.    The Trial Exhibits

The second category of trial materials consists of trial exhibits. As with the lodged deposition transcripts, the exhibits fall into different categories. There are exhibits listed on the Exhibit List that were never used or cited ("Only-Listed Exhibits"). There are exhibits that Pro Publica says the parties used at trial or cited in their post-trial briefs. There are exhibits the court cited in the Opinion. And there are exhibits the parties cited in the pre-trial stipulation.

---

[103] *Guidelines, supra*, at 40.

34

### 1.    The Only-Listed Exhibits

First up are the Only-Listed Exhibits.[104] As they did with the lodged deposition transcripts, SpaceX and Kahlon argue that because they never docketed the trial exhibits, the exhibits never became subject to the right of access. Under the procedure the parties agreed to, the right of access applied to every item used at trial or listed on the Exhibit List. That does not mean, however, that every trial exhibit automatically became public.

Under the traditional mode of presenting evidence, parties do not agree on a list of exhibits in advance; they introduce exhibits one by one as they use them in court. Those exhibits become part of the record and subject to the right of access as they are admitted or used.

In another effort to promote efficiency, the Court of Chancery asks parties to file an exhibit list identifying the exhibits they expect to use at trial. Parties can propose different procedures for admitting the exhibits into evidence.

In this case, the parties agreed that the items identified on the exhibit list would be admitted automatically into the record at the close of trial, subject to any rulings the court has made and any objections identified on the exhibit list. The parties could address the objections if they wished in their post-trial briefs; otherwise, the objections would be waived. That procedure minimized the likely number of

---

[104] JX 42, JX 540.

evidentiary disputes by incentivizing the parties to focus on evidentiary objections that mattered. The procedure also avoided the need for parties to move exhibits formally into the record, whether individually or *en masse*, which takes up trial time.

The pre-trial stipulation contained customary language implementing this procedure. First, the stipulation stated: "The trial record shall be based on live testimony from witnesses, deposition testimony where permissible, the exhibits cited in the Joint Exhibit List, the trial briefs, and the trial on December 16-18, 2024."[105] That sentence confirmed that these materials, including the exhibits on the Exhibit List, became part of the record, making them subject to the right of access. Later, the stipulation stated:

> Unless an objection to a proposed trial exhibit has been noted on the Exhibit List or an objection is raised through motions *in limine*, in pre-trial briefing, or at trial, all exhibits on the Exhibit List shall be deemed admitted into evidence (except any exhibit that has been stricken as a result of an objection ruled upon at trial), subject to the resolution of any objection to its admissibility permitted by this Paragraph. The merits of objections noted on the Exhibit List and in pre-trial briefing, unless resolved at the pre-trial conference or trial, will be addressed in the Parties' post-trial briefs.[106]

In other words, all of the items on the Exhibit List came into evidence subject to the court's rulings and any objections the parties had raised. At that point, they became part of the record and subject to the right of access.

---

[105] Dkt. 221 ¶ 113.

[106] *Id.* ¶ 134.

36

Parties can obtain court approval for other procedures. For example, the

*Guidelines* describe the schedule-of-evidence mechanism:

> In cases with large records, there are often substantial numbers of exhibits and extensive portions of transcripts that are not cited in the briefs or discussed at trial. The failure to reference these materials can raise questions about the scope of the record before the trial court. To address this issue, parties may specify in the pre-trial order that the record for the purposes of the trial court's decision includes only those exhibits or portions of depositions that are used at trial or cited in post-trial briefs or at post-trial argument (subject to the resolution of any objections). Parties also may agree to prepare a Schedule of Evidence after trial, briefing, and post-trial argument that lists the exhibits and deposition excerpts that form the record for purposes of the trial court's decision.[107]

If the court approves an alternative procedure, then the implications of listing an item on the exhibit list could be different.[108]

In this case, the items listed on the Exhibit List became subject to the right of access at the close of trial. That did not mean that they automatically became non-confidential, public documents. The parties agreed to—and the court approved—language confirming that listing an item on the Exhibit List would not automatically make the document public as if used in open court. That language modified the

---

[107] *Guidelines, supra*, at 39–40.

[108] As this passage shows, how trial exhibits become part of the record is not a matter for the parties alone; it affects the court and the right of access. Speaking for myself, if parties have uses a special procedure in the pre-trial order, they should flag it during the pre-trial conference.

Protective Order, which contained the following language from the court-approved form:

> In the event that any Confidential Discovery Material is used in open court during any court proceeding or lodged as a trial exhibit, the material shall lose its confidential status and become part of the public record, unless the Producing Party applies for and obtains an order from this Court specifically maintaining the confidential status of particular material.[109]

The Protective Order thus envisioned that listing a document as a trial exhibit would have two consequences. First, the exhibit would become subject to the right of access. Second, it would lose its confidential status and become a non-confidential part of the public record. The later consequence would mean that a party could not assert that the exhibit contained Confidential Information and could no longer seek to file it confidentially.

In the pre-trial stipulation, however, the paragraph addressing trial exhibits concluded with the following statement: "Notwithstanding anything in this Paragraph, the lodging of exhibits with the Court alone shall not constitute 'use[] in open court during any court proceeding or lodg[ing] as a trial exhibit' under Paragraph 24 of the Protective Order."[110] That language preserved a party's ability to argue that an item listed on the Exhibit List and not used in open court might receive confidential treatment. For purposes of the two questions identified at the

---

[109] Dkt. 41.

[110] Dkt. 221 ¶ 134.

outset of this decision, the language addressed the second, not the first. The language did not limit the scope of the right of access, which applied once the exhibits were admitted into evidence or otherwise used. It did preserve the parties' ability to argue about whether an Only-Listed Exhibit could receive confidential treatment.

Rule 5.1 does not require that parties promptly file public versions of exhibits, including exhibits deemed filed through the filing of an exhibit list.[111] But unlike lodged deposition transcripts, which remained discovery documents until a portion of the deposition was used, the items on the Exhibit List became part of the record and subject to the right of access at the conclusion of trial. Once Pro Publica filed a challenge notice seeking access, the parties had to file public versions.[112]

Here, Kahlon and SpaceX did not file public versions of any Only-Listed Exhibits. Because the court has not previously addressed the issue presented for decision, that failure does not result in waiver. Within ten days, the parties must file public versions of the Only-Listed Exhibits that Pro Publica seeks. Rule 5.1 will govern any further steps in the process.

### 2. Trial Exhibits Used In Open Court

The next category of trial exhibits consists of items used in open court. Generally, trial exhibits become public when used. "Exhibits and evidence presented

---

[111] Ct. Ch. R. 5.1(f)(1).

[112] *Id*. 5.1(g)(4).

39

at trial become[] part of the public record."[113] Once used, they have not been "maintained confidentially" for purposes of Rule 5.1.[114] That means they cannot be filed confidentially.

In an appropriate case, a court might make an exception for a long exhibit whose contents were substantively divisible, such that using one part of the exhibit did not implicate other parts or the entire exhibit. A party who carefully used only part of the exhibit might show that other, truly extraneous portions warranted confidential treatment.[115]

Kahlon seeks confidential treatment for a trial exhibit containing a series of WhatsApp messages between Kahlon and one of the principals of Gulf Asia.[116] The exhibit consists of sixty-three pages of texts. After Pro Publica sought access to the trial exhibit, Kahlon filed a public version in which he redacted fifty-eight pages of texts and made only five pages visible. Kahlon argues that since the exhibit comprised sixteen different text exchanges, the exhibit should be treated as if it were sixteen

---

[113] *NewRadio Gp. LLC v. NRG Media LLC*, 2010 WL 935622, at *1 (Del. Ch. Jan. 27, 2010); *see also Kronenberg v. Katz*, 872 A.2d 568, 576 (Del. Ch. 2004) (discussing the "strong presumption in favor of openness governing evidence and other filings submitted in lawsuits in Delaware courts").

[114] Ct. Ch. R. 5.1(b)(2)(A).

[115] *Cf. Paul*, 2021 WL 3262122, at *4 (applying the "truly extraneous" standard); *GKC*, 2019 WL 2592574, at *6 (same).

[116] JX 17.

exhibits. He claims that only the exchange shown in court and cited in post-trial briefing should be made public.

The compilation is the type of exhibit that a party might conceivably contend contains truly extraneous portions that should be entitled to confidential treatment. Assuming for purposes of analysis that the exception is available and that the other text chains were sufficiently separate, Kahlon has not shown the particularized harm necessary to establish that the other text chains contain Confidential Information. The trial exhibit must be filed publicly.[117]

For its part, SpaceX seeks confidential treatment for a trial exhibit used in open court that consisted of an email from Johnsen attaching two stock purchase agreements.[118] SpaceX filed a public version that redacted three categories of information, but SpaceX did not have that option. That trial exhibit had been used in open court, and the materials SpaceX sought to redact were not severable from the rest of the exhibit. The email was effectively one document. With the exhibit having been used in open court, SpaceX could not show that it had been "maintained confidentially."[119] The trial exhibit must be filed publicly as used in open court.

---

[117] Although not relevant to the outcome, Kahlon's redactions conceal information that is not be entitled to confidential treatment in any event. They include messages like, "I am gonna [sic] respond to his email soon, have just been swamped." JX 17 at 1.

[118] JX 184.

[119] Ct. Ch. R. 5.1(b)(2)(A).

41

SpaceX could not have carried its burden for its redactions in any event. SpaceX redacted from the stock purchase agreements the price per share, the number of shares, and the series of stock being purchased. SpaceX argues that this information deserves the same level of protection as a trade secret, but those basic details about a stock transaction come nowhere close.[120]

Equally important, the information is stale.[121] The stock purchase agreements were for a transaction in 2021. Since then, SpaceX has assembled a lengthy and impressive list of achievements.[122] SpaceX has also engaged in additional financings

---

[120] *See In re Tr. for Gore*, 2011 WL 13175994, at *2 (Del. Ch. Dec. 22, 2010) (rejecting argument for treating share information as confidential because "the policy values served by disclosure of the Share Information outweigh any incidental confidentiality concerns of the parties").

[121] *In re Oxbow Carbon*, 2016 WL 7323443, at *2 (citing *Quantum Tech. P'rs IV, L.P. v. Ploom, Inc.*, 2014 WL 2156622, at *18 (Del. Ch. May 28, 2014) (MASTER'S REPORT)); *see also Okla. Firefighters Pension Ret. Sys. v. Corbat*, 2017 WL 5484125, at *2 (Del. Ch. Nov. 15, 2017).

[122] *See generally* Selam Gebrekidan, *This Was Supposed to Be the Year China Started Catching Up With SpaceX*, N.Y. Times (July 23, 2025), https://www.nytimes.com/interactive/2025/07/23/world/asia/starlink-spacex-musk-china-satellites.html ("SpaceX has about 8,000 Starlink satellites in orbit and is expanding its lead every month"); Kenneth Chang, *NASA and the Defense Department Rely on SpaceX in So Many Ways*, N.Y. Times (June 5, 2025), https://www.nytimes.com/2025/06/05/science/spacex-nasa-trump-elon-musk.html; McKinnon de Kuyper, *SpaceX Achieves Its First-Ever 'Chopsticks' Landing*, N.Y Times (October 13, 2024), https://www.nytimes.com/video/science/space/100000009759445/spacex-launch-starship-catch.html.

at far higher valuations.[123] Even without those intervening events, more than three years have passed, and Rule 5.1 presumptively protects information for only three years.[124] The SpaceX information is now more than four years old.

Finally, the information is readily available. A search using "the tool provided by the company whose name has become a verb"[125] uncovers the 2021 valuation that SpaceX wants to protect.[126]

SpaceX also redacted the names of SpaceX employees in the email chain. Without elaborating, SpaceX claims that disclosing this information would cause harm.[127] This court previously rejected a similar argument about employee names—coincidentally advanced by a company that is now a SpaceX affiliate[128]—noting that

---

[123] Edward Ludlow *et al.*, *SpaceX Valuation to Hit Around $400 Billion in Share Sale*, *Bloomberg* (July 8, 2025), https://www.bloomberg.com/news/articles/2025-07-08/spacex-valuation-said-to-hit-around-400-billion-in-share-sale.

[124] Ct. Ch. R. 5.1(h). Although that limitation technically only applies after final disposition, it suggests a default rule for staleness.

[125] *Sandys v. Pincus*, 152 A.3d 124, 129–30 (Del. 2016).

[126] *See* "SpaceX," *Wikipedia*, https://en.wikipedia.org/wiki/SpaceX ("By October 2021, the valuation of SpaceX had risen to $100.3 billion.") (last visited July 29, 2025); Michael Sheetz, *Elon Musk's SpaceX Hits $100 Billion Valuation After Secondary Share Sale*, *CNBC* (Oct. 8, 2021), https://www.cnbc.com/2021/10/08/elon-musks-spacex-valuation-100-billion.html ("SpaceX has an agreement . . . to sell . . . at $560 a share").

[127] Dkt. 272 at 5–6.

[128] *See* Berber Jin & Becky Peterson, *SpaceX to Invest $2 Billion Into Elon Musk's xAI, Wall St. J.* (July 12, 2025), https://www.wsj.com/tech/spacex-to-invest-2-

"it is hard to fathom how disclosing the name of a Twitter, Inc. employee, standing alone, could harm that employee."[129] As the court observed, the information amounted to "basic employment history that one might post on LinkedIn."[130]

The same is true for company email addresses, which SpaceX also wants to redact. While personal email addresses can warrant redaction,[131] companies typically follow a standard address format.[132] Many third-party websites offer databases of email addresses that reveal those formulas.[133] SpaceX follows a common formula of [firstname.lastname@spacex.com]. Johnsen's company email address is not redacted in the same email chain.[134] Other company email addresses would follow the same

---

billion-into-elon-musks-xai-413934de?reflink=desktopwebshare_permalink. *See generally* Greg Bensinger, *Musk's social media firm X bought by his AI company, valued at $33 billion, Reuters* (Mar. 29, 2025), https://www.reuters.com/markets/deals/musks-xai-buys-social-media-platform-x-45-billion-2025-03-28/ ("Elon Musk's xAI has acquired X in a deal that values the social media platform at $33 billion and allows the value of his artificial intelligence firm to be shared with his co-investors in the company formerly known as Twitter.").

[129] *Twitter*, 2024 WL 4441869, at *3.

[130] *Id*.

[131] *See id*. at *5 ("personal email addresses can be filed under seal").

[132] *What Is the Correct Format Of An Email Address? (With Examples), Indeed Career Guide* (June 18, 2025), https://in.indeed.com/career-advice/career-development/correct-format-of-email-address ("One of the most common formats is firstname.lastname@example.com.").

[133] https://www.email-format.com/.

[134] JX 184.

format. Suhail Rizvi's company email address uses the same format as well and is available in public SEC archives.[135] Pro Publica has not sought the company email addresses, but that is not dispositive. When a party seeks to overcome the right of access, the court must protect the interests of the public.[136] The court "serves not only the litigants before it; it has a public function as well."[137] SpaceX has not carried its burden to justify redacting the email addresses.

SpaceX also redacted two physical addresses that appeared below the signature lines on the stock purchase agreements. Both are publicly available corporate addresses. The first signatory is Rizvi, the address is for his firm, and that address can be found on his firm's website[138] and in public SEC filings.[139] The second signatory is Kahlon, the address is for his firm, and the address appears in public SEC filings.[140]

---

[135]     Standstill     Agreement     (Jan.     30,     2023), https://www.sec.gov/Archives/edgar/data/1803914/000110465923009905/tm235125d 1_ex10-1.htm.

[136] *ADT Hldgs.*, 2017 WL 4317245, at *2.

[137] *Al Jazeera*, 2013 WL 5614284, at *1.

[138] *Google*, "Rizvi Traverse", 52,400 results (July 24, 2025) (where the firm's website is the first search result and metadata displayed is the address at issue).

[139] Rizvi Traverse Management, LLC, Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers (Form ADV) (Mar. 28, 2025), https://reports.adviserinfo.sec.gov/reports/ADV/160733/PDF/160733.pdf.

[140] TBC Dragon Investments VIII, L.P, Notice of Exempt Offering of Securities (Form          D)          (Dec.          7,          2022),

In a final argument, SpaceX asserts that the redacted information is unnecessary for the public to understand the nature of the dispute.[141] That is not the test. Under Rule 5.1, information filed with the court is presumptively public. A party can only keep information confidential by making the showing that Rule 5.1 requires. SpaceX did not make the necessary showing.

Kahlon and SpaceX must refile these exhibits without redactions.

### 3. The Trial Exhibits The Court Cited

Another category consists of trial exhibits that the court cited in the Opinion. The parties have not supplemented their submissions to address the implications of that fact. If they believe that any of these exhibits warrant confidential treatment, then they must file a public version if no version has yet been filed and, if a public version already exists, explain why any redactions warrant continued confidential treatment. Those filings must be made within ten days of this decision. Rule 5.1 will govern further proceedings.

### 4. The PTO Exhibits

The last category consists of three trial exhibits that the parties cited to support factual stipulations in the pre-trial stipulation, which the court entered as

_____

https://www.sec.gov/Archives/edgar/data/1939347/000193934722000001/xslFormDX 01/primary_doc.xml. The SEC filing contains more specific information than what was redacted by SpaceX.

[141] Dkt. 272 at 6.

an order ("PTO Exhibits"). By citing those exhibits in the pre-trial stipulation, the parties made them part of the record and subject to the right of access. Unlike the other issues this decision has addressed, the application of Rule 5.1 to the PTO Exhibits is not novel. The parties used the exhibits by citing them. After Pro Publica sought them by filing its challenge notice, the parties had to file public versions. The parties did not, so they waived their claim to confidential treatment.

To argue against the PTO Exhibits being subject to the right of access, Kahlon and SpaceX point out that the parties did not cite the PTO Exhibits after referencing them in the pre-trial order, but that is no surprise. Having stipulated to those facts, the parties did not have to cite anything else. The parties could simply refer to the stipulations. The failure to keep citing the PTO Exhibits does not negate the right of access. That right attached once the parties used the PTO Exhibits by citing them in the pre-trial order.

Once Pro Publica sought the PTO Exhibits by filing a challenge notice, the parties had to file public versions. They failed to do that, waiving their claim to confidential treatment.

In any event, confidential treatment is not warranted. The first PTO Exhibit consists of Kahlon's responses and objections to Leo Investments' first set of interrogatories.[142] Based on that trial exhibit, the parties stipulated that at least

[142] JX 320.

47

twenty-three of the thirty-nine investment funds that TBC manages have direct or indirect investment in SpaceX.[143] The parties did not redact that stipulation in the public version of the pre-trial order. Kahlon's long history with SpaceX is relevant to a proper understanding of the case.

The next PTO Exhibit is a valuation and set of financials for TBC as of 2023.[144] Based on that trial exhibit, the parties stipulated that Kahlon sought to buy SpaceX common stock in December 2023 at $560 per share.[145] The parties did not redact that stipulated fact in the public version of the pre-trial order, and the expected price of $560 per share bears directly on the public's understanding of the case. Plus, in 2025, the valuation is stale.

The third PTO Exhibit is a set of the Fund's unaudited financial statements for the first quarter of 2023.[146] Based on that trial exhibit, the parties stipulated that the Fund carried its SpaceX shares at a value of $77 per share in March 2023.[147] The parties did not redact that stipulated fact in the public version of the pre-trial order,

---

[143] PTO ¶ 37.

[144] JX 543.

[145] PTO ¶ 95.

[146] JX 524.

[147] PTO ¶ 100.

and the valuation and relationship between the Fund and SpaceX is directly relevant to the public's understanding of the case. Plus, in 2025, the valuation is stale.

The parties must file the PTO Exhibits without redactions.

## III.  CONCLUSION

The parties must proceed in accordance with the rulings made in this opinion. The court has separately asked the parties to take the steps required to bring this case to a conclusion so that a final order can be entered. The only outstanding issue appears to be a fee application. Any further disputes over confidential treatment should not interfere with the entry of a final order. A person could serve a challenge notice at any point, including while an appeal is pending or after final disposition. The confidentiality issues are therefore collateral to the merits and should not delay the entry of a final order that would otherwise constitute the court's last act in the case for purposes of appeal.